**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 22 2013, 9:37 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**FREDERICK A. TURNER**
Bloomington, Indiana

ATTORNEY FOR APPELLEE:

**J. SCOTT CALLAHAN**
Bedford, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| S.R., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 47A01-1210-AD-488 |
| | ) | |
| R.S.Y. and T.L.Y., | ) | |
| | ) | |
| Appellees-Petitioners. | ) | |

APPEAL FROM THE LAWRENCE CIRCUIT COURT
The Honorable Elizabeth A. Cure, Special Judge
Cause No. 47C01-1004-AD-10

**May 22, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

After their daughter died of a drug overdose, R.S.Y. and T.L.Y. (individually, Grandfather and Grandmother, and collectively, Grandparents) sought to adopt B.L.R., their granddaughter, without the consent of S.R. (Father), who is serving a sixty-year sentence for murder and is not eligible for release until B.L.R. turns twenty-seven. The trial court granted the adoption after concluding that Father was unfit to be a parent, that he had abandoned B.L.R., and that he had failed to communicate significantly with B.L.R. for longer than a year.

On appeal, Father claims that the trial court erred in granting B.L.R.'s adoption without his consent. More particularly, Father contends that the trial court erred in taking judicial notice of reports admitted into evidence in earlier, related proceedings, that there was insufficient evidence to show that Father was an unfit parent absent the information contained within those reports, that the trial court erred by entering findings of fact and conclusions of law related to additional statutory factors allowing B.L.R.'s adoption without Father's consent, and that B.L.R. was not adequately represented in the proceedings because the trial court failed to appoint a Guardian Ad Litem (GAL).

Finding no error, we affirm the judgment of the trial court.

FACTS

B.L.R. was born to T.Y. (Mother) on March 9, 2002. Because Mother struggled with drug addiction and did not want B.L.R. to see her on drugs or know when she was in jail or in drug treatment, Mother often left B.L.R. with Grandparents for long periods of time and relied on them to care for her. Moreover, because Mother and B.L.R. often

2

lived with Grandparents even when Mother was not in jail or rehab, Grandparents have helped raise B.L.R. since her infancy.

Soon after B.L.R.'s birth, Mother applied for public assistance and was asked to name B.L.R.'s father so that child support could be established. At first, Mother could not provide the name because she only knew B.L.R.'s father by his nickname, "Red." However, at some point, Mother discovered Red's full name when she saw a news report showing Father's picture and stating that he had been arrested and charged with murder and carrying a handgun without a license in connection with a shooting. After being convicted on both counts, Father received an aggregate sentence of sixty years of incarceration.

Father admitted to paternity in 2005, and B.L.R. was given Father's last name. Child support payments began being deducted directly from Father's prison earnings. Father sought visitation rights, and in December 2006, the paternity court ordered that Father have "phased in" visitation rights, starting with Father being able to exchange photographs and written correspondence with B.L.R. through Mother. Tr. p. 181. This arrangement was to be reviewed in a year to determine the next phase. Father may also have spoken to B.L.R. on the telephone on a number of occasions when he called Mother from prison. However, Father saw B.L.R. only during court proceedings and no more than four times.

Mother passed away in July 2007 as a result of a drug overdose. B.L.R. is unaware that Mother struggled with drug addiction and knows only that Mother died after

3

being ill.  Grandfather became B.L.R.'s permanent guardian.[1]  Several months after Mother died, Grandparents and B.L.R. moved to a new home in Lawrence County with a new telephone number.

Beginning in 2008, Father filed a number of pleadings and motions attempting to obtain visitation with B.L.R through the paternity and guardianship actions.  In September 2008, Father persuaded his parents to file a separate petition for temporary guardianship over B.L.R., but they later withdrew their petition.  On at least one occasion, Father had family members send gifts to B.L.R., but Father did not pay for those items or send any gifts to B.L.R. directly.

In February 2009, Tammy Minger was appointed as the GAL for B.L.R., and the court ordered a mental health evaluation of B.L.R. to determine the effect that visitation with Father may have on her.  Minger filed her first GAL report in May 2009, and Dr. Susan Pauly, who performed the psychological evaluation, filed her report the same month.  In Minger's first GAL report, she recommended a continuation of the "phase-in" parenting time previously ordered under the paternity action.  Ex. 1 p. 11.  However, Minger recommended that visitation at the prison not occur immediately because:

1. [B.L.R.] does not seem to know who her father is;

. . .

3. It would not be good for [B.L.R.] to know that her father is in prison for murder;

---

[1] Grandfather did not serve Father with notice of the guardianship petition, and the guardianship was set aside after a hearing in July 2009.  However, at that time Grandfather was appointed as B.L.R.'s temporary guardian and was still serving in that capacity at the time of the adoption.

5. [B.L.R.] is only 7 years old and will likely need some time to adjust to seeing her father in prison, if that is recommended by Dr. Pauly.

Id. at 10-11.

Dr. Pauly's report indicated that B.L.R. has no memory of Father, and indeed, that B.L.R. told Dr. Pauly during the evaluation that her father was a judge by the name of Drake who lived in Bloomington. The report also explained that B.L.R. suffers from anxiety as "a DIRECT result of the mother and father's poor choices" and that the anxiety "would be exacerbated with any further contact with the father." Ex. 4 p. 4. The report went on to say:

> Though the father appears to have made academic progress in prison and is doing some good volunteer work, I have NO evidence that the antisocial personality characteristics that allowed him to consort with drug addicted females, abuse his wife and commit murder have been treated successfully. From a psychological perspective, it would take years of individual insight oriented therapy to restructure the foundation of his personality. Indeed, his recent letter to the court reflects a strong core of egocentrism about how he feels his rights have been violated as opposed to what is in the best interests of the child.

Id.

In October 2009, Minger filed a supplemental GAL report, in which she stated:

I was disappointed to read [Father's] pleading of September 14, 2009, indicating that he wanted one of his relatives to file for guardianship. After reviewing Dr. Pauly's recommendations and observing [Father's] attempts to remove [B.L.R.] from the only home she has ever known, it is clear that he does not have her best interests at heart. He has a total lack of regard for her feelings. Because of this I recommend that he have no contact with [B.L.R.].

5

Ex. 2 p. 13. Minger thereafter attended a hearing in November 2009, and her reports were admitted as evidence in the paternity and guardianship proceedings.

On January 11, 2010, Father forged a temporary guardianship petition in the name of Iris Brown, one of his relatives. In March 2010, Minger filed her second supplemental GAL report, in which she explained that Brown had neither filed the guardianship petition nor had she authorized Father to do so on her behalf.

On April 1, 2010, Grandparents filed a petition to adopt B.L.R. in Lawrence County. In the petition, Grandparents asserted that Father's consent was unnecessary because he is unfit to be a parent. In July 2010, Grandparents petitioned the adoption court to appoint a GAL for B.L.R., and specifically, to appoint Tammy Minger. Father objected to the appointment of Minger as the GAL in the adoption case. Meanwhile, the guardianship and paternity cases were transferred to Lawrence County to be consolidated with the adoption proceedings. Grandparents' motion for a GAL was never ruled upon.

The trial court held a hearing on the adoption petition on June 22, 2012. At the hearing, Grandparents asked the court to take judicial notice of the three GAL reports and the prior report from Dr. Pauly that had previously been entered into evidence in the paternity and guardianship proceedings. Father objected to the court taking judicial notice of these documents on the grounds that they violated his right to confrontation and contained stale information. In overruling Father's objections, the trial court stated:

> I'm going to take Judicial Notice of the three (3) reports. They were admitted as evidence in related cases and there was a right to confrontation,

he was represented in the prior cases and so I believe that they're proper for Judicial Notice. In addition, I'll take Judicial Notice of the report of Susan Pauly, but she's here as a witness though.

Tr. p. 19.

Consistent with the recommendations contained in her 2009 report, Dr. Pauly testified at the adoption hearing that having contact with Father would be "detrimental" to B.L.R. Id. at 39-40. Specifically, Dr. Pauly expressed the following concerns:

> Well, first of all . . . he is a stranger to her. She has no recollection of him whatsoever. . . . [A]lso, from the concept of who loves me and who takes care of me, her idea of who is in that caretaking role is her grandmother and her grandfather and so to introduce someone now that she has no recollection of . . . would be a complete mind shift for her at this point in time, coupled with the fact that her dad . . . is incarcerated the visits would have to occur in a prison setting, which you know, it's intimidating for even an adult to go through the procedures to visit with someone in prison. She has never been exposed to anything such as that. . . . [I]t would take a great deal of work on a therapy perspective to prepare her for that and, you know, I understand that [Father] will be incarcerated for quite some period of time. So his ability to contribute to her emotional well-being if a relationship were to be established is minimal. . . . [A]nd to be able to parent her is, the ability to do that is just not there . . . .

Id. at 36-39.

Further testimony at the hearing established that Father has two additional children, a seventeen-year-old son born in August 1994 and a thirteen-year-old son born in July 1998. The last time Father saw his older son was 1998, and the last time Father saw his younger son was 2002. There was no evidence presented at the hearing that Father has maintained contact with either child. Moreover, since Mother died, Father has not sent any letters or other correspondence to B.L.R. directly or through the court, and

7

Father has neither seen nor spoken to B.L.R. since Mother's death. Finally, Father has an earliest possible release date of July 1, 2029.

At the conclusion of the hearing, the trial court took the matter under advisement. On September 28, 2012, the trial court entered extensive findings of fact and conclusions of law, ultimately relying on three grounds—abandonment, lack of significant communication for more than a year, and parental unfitness—for granting the Grandparents' adoption of B.L.R. without Father's consent. Father now appeals.

DISCUSSION AND DECISION[2]

On appeal, Father argues that Grandparents failed to prove that his consent to B.L.R.'s adoption was unnecessary. More particularly, Father asserts that the trial court erred in taking judicial notice of the GAL reports and Dr. Pauly's initial report and that, as a result, many of the facts relied upon by the trial court in finding Father to be an unfit parent were not properly before the court and therefore could not support the adoption without his consent. Father also contends that the trial court erred by including in its order additional reasons why B.L.R. could be adopted without his consent—namely, abandonment and lack of significant communication—when Grandparents' adoption petition alleged only the reason of parental unfitness. Finally, Father contends that the trial court erred by not appointing a GAL for B.L.R. in the adoption proceedings.

---

[2] Grandparents contend that Father's appeal should be summarily dismissed because Father's brief fails to substantially comply with our appellate rules. Although Father's brief is not perfect, we prefer to decide cases on their merits and will generally do so unless the failure to abide by our appellate rules is so egregious that it impedes our review of the alleged errors. See Ramsey v. Review Bd. of Ind. Dep't of Workforce Dev., 789 N.E.2d 486, 487 (Ind. Ct. App. 2003).

Given the considerable amount of deference appropriately given to trial court decisions in family law matters, we will not disturb a trial court's ruling in an adoption proceeding unless the evidence leads to but one conclusion and the trial judge reached the opposite conclusion. In re Adoption of M.L., 973 N.E.2d 1216, 1222 (Ind. Ct. App. 2012). Additionally, when a trial court enters specific findings of fact and conclusions of law, as is the case here, we first determine whether the evidence supports the trial court's findings, and we then determine whether the findings support the judgment. In re Adoption of K.F., 935 N.E.2d 282, 287 (Ind. Ct. App. 2010). Neither will be set aside unless clearly erroneous. Id. Considering only the evidence favorable to the judgment, a trial court's findings of fact are clearly erroneous when there is no evidence or reasonable inferences supporting them, and a judgment is clearly erroneous when it is unsupported by the findings and the conclusions relying on those findings. Id.

Because Grandparents sought to adopt B.L.R. without Father's consent, it was their burden to prove that his consent was not required. In relevant part, Indiana Code section 31-19-9-8(a) provides that consent is not required from:

> (1) A parent . . . if the child is adjudged to have been abandoned or deserted for at least six (6) months immediately preceding the date of the filing of the petition for adoption.
>
> (2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
>
>> (A) fails without justifiable cause to communicate significantly with the child when able to do so; or

9

(B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

. . .

(11) A parent if:

(A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and

(B) the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent.

Additionally, "[i]f a parent has made only token efforts to support or to communicate with the child the court may declare the child abandoned by the parent." Ind. Code § 31-19-9-8(b).

## I. Findings of Fact and Judicial Notice

Father first alleges that numerous findings of fact in the trial court's order are clearly erroneous because the trial court erred when it took judicial notice of the GAL reports and a psychological report that had previously been admitted as evidence in the related paternity and guardianship proceedings. We first observe that, contrary to Father's assertions, many of the factual findings are in actuality supported by evidence other than the GAL reports and Dr. Pauly's report. Indeed, many of the findings Father claims are erroneous were supported by Father's own testimony. See, e.g., tr. p. 218-19 (supporting findings A.2, A.3, and A.4), 224 (supporting findings D.1 and D.2). And numerous other findings were supported by the live testimony of Grandparents and Dr.

10

Pauly. <u>See</u> tr. p. 85-94, 114-120 (supporting findings F.3, F.4, F.6, F.9, F.25), 22-71 (supporting numerous findings under section G).

Nevertheless, as is suggested by Father, several of the trial court's findings could only have been obtained from facts contained in the reports written by the GAL and Dr. Pauly, and thus, we must determine whether judicial notice of these reports was proper. Father raises his objections under Indiana Evidence Rule 201(a), which provides that a court may take judicial notice of a fact but that "[a] judicially-noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Ind. Evid. R. 201(a). Father contends that the facts contained within the GAL report and Dr. Pauly's report are subject to reasonable dispute and that the trial court therefore violated his right to confront witnesses when it took judicial notice of the facts contained within the reports.

Rather than defending the trial court's action under Evidence Rule 201(a), Grandparents assert that a 2010 amendment to Evidence Rule 201(b) permitted the trial court to take judicial notice of the reports as "records of a court of this state." Appellees' Br. p. 11 (citing Evid. R. 201(b)(5)). This Court has now had occasion to interpret Evidence Rule 201(b)(5) a number of times. In doing so, we have held that a trial court may take judicial notice of facts contained within documents admitted as evidence in related proceedings. <u>See</u> <u>In re D.K.</u>, 968 N.E.2d 792, 796 (Ind. Ct. App. 2012) (stating

that judicial notice of documents filed in a Child in Need of Services (CHINS) action was proper in a later Termination of Parental Rights (TPR) case); see also In re Paternity of P.R., 940 N.E.2d 346, 350 (Ind. Ct. App. 2010) (stating that it was not error for a trial court to take judicial notice of facts in a protective order case file when deciding a custody modification petition even after the modification hearing concluded and neither party had requested that the trial court take judicial notice).

Still, Father maintains that the trial court violated his constitutional right to confront witnesses by taking judicial notice of the reports. In Haley v. State, 736 N.E.2d 1250, 1252-53 (Ind. Ct. App. 2000), this Court explained that "although judicially noticed facts are contradictory to the right of confrontation, they are admissible so long as the requirements of Indiana Rule of Evidence 201 are met." Indiana Evidence Rule 201(e) requires parties to be given, upon request, "an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed."

Here, the trial court gave Father repeated opportunities to contest its decision to take judicial notice of the reports, and Father took advantage of each of these opportunities. Tr. p. 8-10, 14-19. Moreover, Father was able to fully cross-examine Dr. Pauly about her report at the adoption hearing, and because Minger had been available for cross-examination at the consolidated paternity and guardianship hearings where her first two reports were previously entered into evidence, the trial court did not violate his

12

right to confront witnesses by taking judicial notice of those reports.[3]  Finally, Father was able to present his own evidence refuting the facts alleged in the reports.

## II.  Necessity of Father's Consent and Appropriateness of Additional Reasons

Having decided that the trial court did not err when it took judicial notice of the GAL reports and Dr. Pauly's report, we next turn to Father's argument that the trial court erred when it determined that his consent was not required for B.L.R.'s adoption by Grandparents.  As noted above, the trial court found that three separate reasons under Indiana Code section 31-19-9-8 permitted the adoption without Father's consent.  Father contests each of these reasons, claiming that Grandparents failed to prove that he is an unfit parent and that the trial court improperly looked to the other statutory factors that dispense with the necessity of a parent's consent.

The Indiana Code does not define what it means for a parent to be "unfit."  In re Adoption of M.L., 973 N.E.2d 1216, 1223 (Ind. Ct. App. 2012).  However, in examining the plain and ordinary meaning of the word, we have previously held that unfit means

---

[3] We note that although Father previously had the opportunity to cross-examine Minger about her reports, it does not appear that the trial court took judicial notice of the transcripts from those earlier hearings and thus Father may not have received the full benefit of his right to cross-examine witnesses in the adoption proceeding.  See Graham v. State, 947 N.E.2d 962, 964-65 (Ind. Ct. App. 2011).  Nevertheless, Father's rights were protected when the trial court gave Father the opportunity to respond to the request for judicial notice as required by Evidence Rule 201(e).

Moreover, to the extent Father argues that the trial court violated his right to confront witnesses by taking judicial notice of the GAL's third report, it appears that the only additional information contained within this report concerned Minger's discussion with Iris Brown in which Minger discovered that someone had forged Brown's signature on a petition for guardianship of B.L.R.  Father admitted to committing this forgery at the adoption hearing, tr. p. 227, and thus, Father can demonstrate no prejudice resulting from the trial court taking judicial notice of this report.  As a result, any error was harmless.  See In re Adoption of M.A.S., 815 N.E.2d 216, 223 (Ind. Ct. App. 2004).

13

"unsuitable; not adapted or qualified for a particular use or service" or "morally unqualified; incompetent." Id.

Father claims that his incarceration cannot be the sole reason for the court's finding that he is an unfit parent. This Court has held that "while a parent's incarceration should not operate automatically as an abandonment neither should it foreclose the possibility of such a finding." In re Herman's Adoption, 406 N.E.2d 277, 280 (Ind. Ct. App. 1980) (emphasis added). We have not found a similar case holding that incarceration alone cannot form the sole basis for a finding of parental unfitness under the adoption statutes. Regardless, the trial court had many additional facts before it that support the finding that Father is an unfit parent.

Certainly, the fact that Father was convicted of murder, as opposed to a non-violent charge, is relevant to whether Father is a fit or unfit parent. Also relevant is the fact that B.L.R. will be twenty-seven years old as of Father's earliest possible release date, meaning that Father will not be available to parent B.L.R. in the traditional sense at all during her minority. Moreover, both Minger and Dr. Pauly recommended against Father having any sort of contact with B.L.R., and Father demonstrated that he does not have B.L.R.'s best interests at heart when he forged a petition to have one of his relatives obtain guardianship over B.L.R. and remove her from the only home she has ever known. Ex. 2 p. 13; Tr. p. 39-40, 227. Finally, Father's relationships with his other two children are not convincing evidence of his fitness to be a parent. Having testified that he has not

14

seen his older son since 1998 or his younger son since 2002, it is apparent that Father has not maintained significant relationships with either of his other children. Tr. p. 223.

Because Indiana Code section 31-19-9-8 is written in the disjunctive and we find that sufficient evidence supported the trial court's finding that Father is unfit to be a parent, we need not also determine whether there was sufficient evidence to support the trial court's conclusions that Father had abandoned B.L.R. or that Father failed to communicate significantly with B.L.R. However, we do note that it was not error for the trial court to enter findings and conclusions relating to those statutory factors merely because they were not specifically alleged in Grandparent's adoption petition. But even had it been error, Father waived this objection at the trial court level by failing to object. During the adoption hearing, Father did not object when the trial court made the following statement:

> Before I get to the best interests of the child under a situation where there is no consent I have to find that he's unfit, that he's abandoned the child, that something has happened that means he's shown no interest for a certain statutory period of time . . . .

Tr. p. 152. "A party may not sit idly by at trial allowing an error to occur without objection and then raise such error on appeal." In re Adoption of B.C.S., 793 N.E.2d 1054, 1061 (Ind. Ct. App. 2003). Thus, Father has waived this issue.

### III. Failure to Appoint a GAL

Finally, Father contends that the trial court erred by not appointing a GAL to represent B.L.R.'s interests in the adoption proceedings. However, as noted above,

Grandparents filed a motion asking the adoption court to appoint a GAL for B.L.R., and Father objected to this motion. Appellant's App. p. 63-64, 66-67. Thus, any error in the trial court's failure to appoint a GAL was invited by Father and is not available for judicial review. See B.C.S., 793 N.E.2d at 1061 (stating that "a party may not appeal invited error").

The judgment of the trial court is affirmed.

MAY, J., and MATHIAS, J., concur.