

FILED

Sep 07 2012, 8:59 am

CLERK
of the supreme court,
court of appeals and
tax court

**FOR PUBLICATION**

ATTORNEY FOR APPELLANT:

**SHELLEY HILES HAYMAKER**
Noblesville, Indiana

ATTORNEY FOR APPELLEES:

**CHARLES P. RICE**
Boveri Murphy Rice, LLP
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE ADOPTION OF M.L.;[1]                    )
                                              )
J.H.                                          )
                                              )
    Appellant-Respondent,                 )
                                              )
        vs.                          )    No.  29A02-1201-AD-54
                                              )
J.L. and C.L.,                                )
                                              )
    Appellees-Petitioners.                )

## APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Steven R. Nation, Judge
Cause No. 29D01-1010-AD-1512

**September 7, 2012**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

---

[1] At the trial level, this case was captioned *In re Adoption of M.L.* and concerned J.L. and C.L.'s petition to adopt two children, M.L. and L.H. J.H. is the father of L.H. but not M.L.; therefore, although M.L. is a party of record, this appeal concerns only the adoption of L.H.

**Case Summary**

In 2008, J.L. and C.L. (collectively, "the Adoptive Parents") became concerned that their grandson, M.L., and his half-brother, L.H., were not being properly supervised. The Adoptive Parents obtained a guardianship over M.L. and L.H. L.H.'s father, J.H. ("Father"), consented to the guardianship due to his inability to take care of his son at that time. Since then, L.H. and M.L. have remained in the Adoptive Parents' care.

In October 2010, the Adoptive Parents filed a petition to adopt L.H., which Father contested. The Adoptive Parents argued that Father's consent was not necessary because he had failed to communicate significantly with L.H. for a period of one year, had failed to support L.H. for a period of one year when he was able to do so, and was unfit to be a parent. After an evidentiary hearing, the trial court found that the Adoptive Parents had established all three grounds for dispensing with Father's consent. The trial court found that adoption was in L.H.'s best interests and granted the Adoptive Parents' petition.

Father appeals, arguing that the evidence is insufficient to prove that his consent was not required and that adoption was in L.H.'s best interests. Given Father's history of substance abuse, his history of depression, his reluctance to follow treatment recommendations, his lack of insight, and his instability in housing and employment, we conclude that there is sufficient evidence that Father is unfit to parent; therefore, we need not address the alternate grounds for dispensing with his consent. In addition, the evidence favorable to the judgment indicates that L.H. lacks a bond with Father, but is bonded with the Adoptive Parents and M.L.; that the Adoptive Parents have provided a stable home, which

2

L.H. views as his home; and that the Adoptive Parents have been successfully addressing L.H.'s developmental issues. This evidence is sufficient to show that adoption is in L.H.'s best interests. Therefore, we affirm.

**Facts and Procedural History**

In March 2005, Father started living with T.C. ("Mother") and her son, M.L. Although he is not the biological father of M.L., Father viewed himself as M.L.'s father. Around January 2006, Father and Mother were evicted from their apartment. Although Mother was pregnant with L.H. at this time, she and Father went their separate ways for a while. L.H. was born on July 6, 2006, and Father resumed living with Mother and the children around this time. In November 2007, Father and Mother split up again, and Mother took the boys with her.

In the summer of 2008, J.L., who is the paternal grandfather of M.L., became concerned that M.L. and L.H. were not being properly supervised. The Adoptive Parents took M.L. and L.H. into their home, and in the fall of 2008, with the biological parents' consent, they became the boys' guardians.

During this timeframe, Father was under the strain of losing his mother, losing a job, losing his girlfriend (Mother), and losing the boys. Father was drinking "rather heavily" – half a gallon of hard liquor each week. Tr. at 106. Father was charged with operating while intoxicated in July 2008. In September 2008, Father twice attempted to commit suicide within a short period of time. Father was hospitalized and diagnosed with depressive disorder, alcohol dependence, and cannabis dependence. He was later referred to Aspire,

3

where he had an assessment on December 23, 2008. The assessment indicates that Father's longest period of sobriety had been one month, that Father did not view drug use as a problem, and that he lacked insight into his condition. He was diagnosed with polysubstance dependence, depressive disorder, and alcohol dependence. Father received treatment from Aspire from May to August 2009. Due to the turmoil in his life, Father visited with L.H. only a few times between October 2008 and December 2009.

In February 2009, Father began living with his father and stepmother, B.H. and J.H. For a few months, B.H. made arrangements with the Adoptive Parents to have L.H. overnight every other Saturday. At this time, Father's license was suspended, so he got a job at Embry's Market, which was within walking distance. He generally worked on weekends and did not return home until everyone was asleep; thus, he did not have much interaction with L.H. at home. However, Father claimed that Mother would bring the boys to Embry's to see him.

In June 2009, Father and his current girlfriend, E.R., began living with family friends, Phil and Brenda Hendricks. In February 2010, Father and E.R. started living with E.R.'s parents, G.R. and P.R.

In April 2010, Father's license was reinstated and he was able to take a better job, where he is still employed. Father set up a weekly visitation schedule with the Adoptive Parents. The Adoptive Parents allowed Father to have unsupervised visits with L.H. and M.L. for two to three and a half hours each week. In August 2010, Father and E.R. got their own apartment and soon thereafter had a baby girl.

In October 2010, the Adoptive Parents filed petitions to adopt M.L. and L.H. The two cases were eventually consolidated. In November 2010, the Adoptive Parents decided to stop allowing Father to take the boys, but did allow him to continue weekly visits in their home. In January 2011, the Adoptive Parents reduced visits to every other week because they and the boys were busy with family activities. On February 22, 2011, Father came to the Adoptive Parents' home for a visit. Father did not feel comfortable participating in the family dinner, so he excused himself and went outside, although it was a cold day. While he was at the Adoptive Parents' house, he also made several long trips to the bathroom. The Adoptive Parents were concerned about what he was doing while he was alone and felt that his behavior was odd. In a letter dated March 3, 2011, the Adoptive Parents informed Father that they were suspending his visitation. In April 2011, the Adoptive Parents began allowing Father to see L.H. at a restaurant for about one hour every other week.

On September 19 and 20, 2011, the court held an evidentiary hearing on the Adoptive Parents' petition to adopt L.H. By this time, Mother had been dismissed from the proceedings, and the court had dismissed Father's motion to contest the adoption of M.L.[2] Thus, the primary issue was whether Father's consent to the adoption of L.H. was required.

At the hearing, it was established that Father had a long history of drug use, mental health issues, frequent moves, and frequent changes in employment. Father identified his parents' divorce when he was eight as the starting point of his troubles. Father testified that

---

[2] The trial court's order granting the petition to adopt indicates that Mother was dismissed "for failing to prosecute [her] Motion to Contest without unreasonable delay pursuant to I.C. 31-19-9-18." Appellant's App. at 10.

5

there were "periods of verbal abuse" by his father. *Id*. at 27. At the age of twelve, Father began struggling with depression, cutting himself, and using marijuana. During his high school years, Father lived with his mother in Arizona. She suffered from multiple sclerosis, fibromyalgia, and glaucoma. She smoked marijuana on a daily basis and allowed Father to smoke it with her. Father also experimented with a variety of drugs, including inhalants, methamphetamine, cocaine, and hallucinogens. Father admitted that he was "self-medicating" and "just doing what I knew felt good just to improve the way I felt about life." *Id*. at 32. Father graduated high school in 2000 and continued to live with his mother, do drugs, and drink alcohol while he shifted from job to job. In July 2002, he moved to Arcadia to live with his father, who had also smoked marijuana in the past.

In September 2003, Father moved to Valparaiso to be near his mother, who by this time was in very poor health and needed assistance. In February 2004, he started working for Valparaiso University. In July 2004, he found out that his girlfriend was cheating on him with one of his coworkers. Father punched a wall in his apartment and broke his hand. He then went to work, confronted his coworker, and threw a table at a window. As a result, Father was fired. After that, Father continued to shift from job to job.

In October 2004, Father was arrested for public intoxication and assault. His medical records indicate that he was taken to St. Anthony Memorial Health because he had attempted to kill himself with a knife and had also brandished the knife at a friend who tried to intervene. Father had little memory of the incident because had consumed alcohol and Klonopin, for which he did not have a prescription. Father was diagnosed with major

6

depressive disorder, dysthymic disorder, alcohol abuse, and a self-inflicted chest wound. Father reported that he had been drinking a six-pack of beer or more three to four nights a week. He had thirty-five to forty scars on his chest and arms from cutting himself.

Father was discharged after a couple days. At that time, he indicated that he was planning to move to Oklahoma City with his half-brother and would follow up with treatment there. Instead, he moved to Noblesville to live with his father, and he did not follow through with treatment until he was ordered to do so as a result of his criminal charges. On December 1, 2004, he began treatment with Community Addictions Services of Indiana ("CASI"). He was diagnosed with alcohol dependence and cannabis abuse and was found to have poor judgment and insight. He was successfully discharged in April 2005, although Father admitted that he continued to drink during the time that he was receiving treatment from CASI.

Father testified that he continued to use marijuana until at least 2008 and that he had not used "hard" drugs (by which he meant drugs other than marijuana or alcohol) since 2002, except in conjunction with his suicide attempt in 2004. He stated that there was a period of time after the boys were no longer living with him where he was using drugs daily, but he claimed that "otherwise it was very, very intermittent." *Id*. at 35. He does not feel that it is necessarily bad to smoke marijuana. He acknowledges that he has been advised to stop drinking multiple times, but he did not feel that his alcohol use was "as serious as they [medical professionals] try to make it." *Id*. at 72. He feels that it is "okay" to use alcohol as long as "it doesn't interfere with my life." *Id*. at 73-74. In response to the Adoptive Parents'

7

interrogatories, Father admitted that he was drinking half a pint of whiskey or vodka several nights a week between February 2009 and February 2010. Due to the tolerance that he has developed, Father testified that this amount of alcohol gives him "just a mild buzz." *Id*. at 218. He testified that he currently goes one to three weeks without drinking, but still uses it as "a way to unwind in the evening" when he can afford to do so. *Id*. at 178. Father believes that he is not currently depressed or dependent on alcohol. He does not like to take medication for depression and prefers to deal with it on his own. He testified that he had not cut himself since 2008. He felt that 2008 was the hardest period of his life and that, since then, he has realized that he can "act out" based on his feelings. *Id*. at 193.

In 2008, Father earned about $6000 in income. In 2009, he earned approximately $13,000, and in 2010, he earned approximately $20,000. Father received food stamps from September 2010 until February or March 2011. As of August 2011, he was living paycheck-to-paycheck and had only a few dollars in his bank accounts. When Father had visitation with L.H. or with both boys, he paid for their meals and transportation as well as some small gifts. Father paid the Adoptive Parents a total of $60 in support during the time that L.H. lived with them, and he also paid $60 toward L.H.'s soccer registration fee. Father wavered about his ability to provide for L.H. from 2008 on, but agreed that, at a minimum, the money that he spent on alcohol could have been used to support L.H.

Father testified that he consented to the guardianship because, at the time, he "wasn't in a position to properly take care of the boys." *Id*. at 131. He stated that he did not visit the boys between October and December 2008 because of his suicide attempts and he did not

8

"think it was good for the boys to see me when I was struggling so hard and not thinking clearly." *Id*. at 132. Father acknowledged that, as far as he was aware, the Adoptive Parents had given L.H. a "stable, nurturing environment." *Id.* at 99. He feels that L.H. and M.L. "should have a lifelong brotherly bond" and that they "should always have an opportunity to know each other." *Id.* at 101.

L.H. refers to the Adoptive Parents as Nana and Pop-Pop. When he first started living with the Adoptive Parents, L.H. had developmental delays in his growth and speech, both of which have improved since living with the Adoptive Parents. J.L. testified that, because he owns his own business and works out of his home, he is usually L.H.'s caregiver during the day. C.L. comes home from work around 6:00 p.m. and helps L.H. with school work. Adoptive Parents, L.H., and M.L. have dinner as a family, followed by family activities such as reading or playing games. The Adoptive Parents have five grandchildren, and L.H. has become close to them, especially a granddaughter who attended the same preschool as L.H.

The Adoptive Parents each testified to behavior by Father that made them concerned about his emotional stability. J.L. testified that Father has some "odd behaviors," such as "[g]lazed looks," a "sullen appearance," or a "lack of response." *Id*. at 269, 289. C.L. acknowledged that Father would play with the boys, but it seemed "like he wasn't really there." *Id*. at 307. She described Father as "a very sullen individual. He comes across very polite, but it's almost as if he's kind of a shell of a person.… I just find him a little bizarre." *Id*. at 307-08. C.L. testified that L.H. is always glad to see Father, but is "always very glad to see most everybody." *Id*. at 310. The Adoptive Parents do not believe that L.H. is bonded

9

to Father and do not see signs that he is missing Father. C.L. testified that they stopped allowing Father to visit L.H. outside of their home because they were concerned that the adoption proceedings "might be a stressor for him," and in light of Father's past methods of dealing with stress, they were concerned for L.H.'s safety. *Id.* at 319.

Father presented testimony from his father, his stepmother, E.R.'s parents, and Brenda Hendricks. These witnesses testified that they thought that Father was a good father and had made improvements in his life since 2008. However, each of these witnesses was either unaware that Father was continuing to drink alcohol or unaware that he was drinking to the extent that he had admitted in his answers to the Adoptive Parents' interrogatories. For their part, the Adoptive Parents felt that they had not seen any changes since 2008 and expressed concern that Father would continue his patterns of instability and substance abuse. The Adoptive Parents felt that it was in L.H.'s best interests to be adopted because he had come to view them as his parents and felt comfortable in their home.

On December 29, 2011, the trial court issued an order finding that Father's consent was not required and that adoption was in L.H.'s best interests; therefore, the court granted the adoption petition. The court concurred with the Adoptive Parents' description of Father's demeanor: "On the stand, [Father] was polite but had a disturbing [a]ffect which, in the Court's opinion as the finder of fact, is reflective of his failure to obtain treatment for his serious psychological problems." Appellant's App. at 13. The trial court gave limited credit to the testimony of B.H., J.H., Brenda Hendricks, and E.R.'s parents because they had limited opportunity to observe Father's parenting skills and/or were unaware of the extent of Father's

10

drinking. The court found that Father's consent was not required because he had failed to communicate significantly with L.H., had failed to provide for L.H. when he was able to do so, and because he was unfit. The court also found that adoption was in L.H.'s best interests. Father now appeals.

## Discussion and Decision

"When reviewing the trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion." *In re Adoption of M.B.*, 944 N.E.2d 73, 76 (Ind. Ct. App. 2011). We do not reweigh the evidence on appeal, but instead we examine the evidence most favorable to the trial court's decision together with reasonable inferences drawn therefrom, to determine whether sufficient evidence exists to sustain the decision. *Id.* Moreover, we generally give considerable deference to the trial court's decision in family law matters, as we recognize that the trial judge is in the best position to judge the facts, determine witness credibility, get a feel for the family dynamics, and get a sense of the parents and their relationship with their children. *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 940 (Ind. 2005).

The Adoptive Parents alleged that Father's consent to the adoption was not required pursuant to Indiana Code Section 31-19-9-8, which provides in relevant part as follows:

> (a) Consent to adoption, which may be required under section 1 of this chapter, is not required from any of the following:
>
> ....

11

(2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:

(A) fails without justifiable cause to communicate significantly with the child when able to do so; or

(B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

….

(11) A parent if:

(A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and

(B) the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent.

The Adoptive Parents, as the petitioners, had the burden of proving by clear and convincing evidence that consent was not required. *In re Adoption of M.A.S.*, 815 N.E.2d 216, 220 (Ind. Ct. App. 2004). The provisions of Indiana Code Section 31-19-9-8 are written in the disjunctive; therefore, they each provide independent grounds for dispensing with parental consent. *In re Adoption of T.W.*, 859 N.E.2d 1215, 1218 (Ind. Ct. App. 2006). Regardless of which provision is relied on, adoption is granted only if it is in the best interests of the child. Ind. Code § 31-19-11-1(a).

We will address Father's fitness first. The statute does not provide a definition of "unfit." The interpretation of a statute is a pure question of law, which we review de novo. *M.S. v. C.S.*, 938 N.E.2d 278, 282 (Ind. Ct. App. 2010). "In construing a statute, our primary goal is to determine and effectuate the legislative intent." *Id*. We give words and phrases their plain and ordinary meaning. *Id*. at 284.

12

Black's Law Dictionary defines "unfit" as "[u]nsuitable; not adapted or qualified for a particular use or service" or "[m]orally unqualified; incompetent." BLACK'S LAW DICTIONARY 1564 (8th ed. 2004). Father and the Adoptive Parents have both looked to cases where parental rights have been terminated as a result of a petition made by the Department of Child Services ("DCS") for guidance. In termination cases, DCS is required to allege, inter alia, that there is "a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied," that there is "a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child," or that the child "has, on two (2) separate occasions, been adjudicated a child in need of services." Ind. Code § 31-35-2-4(b)(2). Although Indiana Code Section 31-35-2-4 does not use the word "unfit," we have frequently referred to its provisions as indicators of a parent's fitness, and termination cases clearly deal with a parent's suitability or competence to be a parent. *See*, *e.g.*, *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010) ("In determining whether the conditions that led to a child's removal will not be remedied, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing…"). The termination statutes and adoption statutes strike a similar balance between the parent's rights and the child's best interests.

Therefore, we agree that termination cases provide useful guidance as to what makes a parent "unfit." In these cases, we have considered factors such as a parent's substance abuse, mental health, willingness to follow recommended treatment, lack of insight, instability in housing and employment, and ability to care for a child's special needs. *See In re J.S.*, 906

13

N.E.2d 226, 235 (Ind. Ct. App. 2009) (affirming termination of parental rights based on parents' drug use and inability to maintain stable housing and employment); *C.T. v. Marion Cnty. Dep't of Child Servs.*, 896 N.E.2d 571, 582 (Ind. Ct. App. 2008) (affirming termination of parental rights based on mother's pattern of failing to address mental health deficiencies, long-standing addiction to drugs, and past and present inability to provide safe, stable, and nurturing home), *trans. denied* (2009); *In re A.B.*, 887 N.E.2d 158, 169-70 (Ind. Ct. App. 2008) (affirming termination of parental rights based on mother's instability, lack of participation in counseling, and inability to provide permanency for special needs child); *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004) (affirming termination of parental rights where mother failed to follow through with treatment for mental health issues and substance abuse), *trans. denied*; *In re J.T.*, 742 N.E.2d 509, 512-13 (Ind. Ct. App. 2001) (affirming termination of parental rights based on mother's lack of progress and insight), *trans. denied*.

Each of these factors is present in this case. Father has a long history of depression and self-medicating with drugs and alcohol. He is reluctant to follow treatment advice for his mental health issues or substance abuse issues. He minimizes the seriousness of these issues and believes that he can control them on his own despite the fact that his untreated conditions have resulted in suicide attempts, cutting himself, arrests, loss of his license, and difficulty maintaining employment and stable housing. Father has hidden the extent of his drinking from his friends and family members, and the trial court also found that Father attempted to downplay the extent of his drinking and drug use in his testimony. *See* Appellant's App. at

14

15 (in paragraphs 47-49 of its order, the court compares Father's testimony with statements made in his deposition and answers to interrogatories, which were admitted as exhibits). There is no indication that Father intends to quit drinking. The Adoptive Parents expressed concern that his demeanor was indicative of ongoing mental health issues. The trial court found that his demeanor on the stand was consistent with what the Adoptive Parents described.

In L.H.'s six years of life, Father has had eight different addresses and five different jobs. L.H. came to the Adoptive Parents with developmental delays in his speech and growth, which have been improving under their care. Father has contributed little to L.H.'s support and continues to struggle financially. He has not been able to provide the stable home that L.H. needs.

Father points out that he has had fewer changes in his employment and living situation in recent years and has avoided a meltdown of the sort that he experienced in 2008. Even if Father's conduct from 2009 forward has arguably improved, the evidence favorable to the judgment reflects that Father remains in denial about the seriousness of his alcohol use and mental health issues and is therefore vulnerable to a recurrence of his past problems. Father's argument essentially asks us to reweigh the evidence, which we will not do. We conclude that there is sufficient evidence to support the trial court's conclusion that Father is not a fit parent. Therefore, we need not address the court's alternate grounds for dispensing with Father's consent.

We turn then to L.H.'s best interests. The primary concern in every adoption proceeding is the best interests of the child. *In re Adoption of J.B.S.*, 843 N.E.2d 975, 977 (Ind. Ct. App. 2006).

> The State has a strong interest in providing stable homes for children. To this end, early, permanent placement of children with adoptive families furthers the interests of both the child and the State. An adoption enables a child to be raised in a stable, supportive, and nurturing environment and precludes the possibility of state wardship.

*Id*. (citations omitted). It is undisputed that the Adoptive Parents have provided L.H. with a stable, nurturing environment. It is also undisputed that L.H. has a strong bond with M.L. L.H. views the Adoptive Parents as his parents and their home as his home. L.H. is not bonded with Father on that level. The Adoptive Parents are able to provide for all his needs, including his special developmental needs. This evidence supports the trial court's conclusion that adoption is in L.H.'s best interests. Therefore, we affirm.

Affirmed.

RILEY, J., and BAILEY, J., concur.