Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the



FILED

Feb 07 2014, 10:15 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DAVID W. STONE, IV**
Stone Law Offices
Anderson, Indiana

ATTORNEY FOR APPELLEE:

**ANTHONY C. LAWRENCE**
Anderson, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE: ADOPTION OF L.A.C. AND S.T.A., S.C. AND L.A., | ) ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No. 48A02-1305-AD-462 |
| N.C. and K.R., | ) ) | |
| Appellees-Petitioners. | ) | |

APPEAL FROM THE MADISON CIRCUIT COURT
The Honorable Dennis Carroll, Special Judge
Cause No. 48C01-1111-AD-62

**February 7, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Judge**

Appellants L.A. ("Father") and S.C. ("Mother") appeal the trial court's decision to allow the adoption of their minor children, S.A. and L.C., without parental consent. Appellants raise the following issues for our review: (1) whether certain findings of fact made by the trial court are not supported by the evidence; (2) whether the conclusion that Mother and Father are unfit was clearly erroneous; and (3) whether adoption is in the children's best interests. Concluding the evidence is sufficient to show Mother and Father are unfit and that adoption is in the children's best interests, we affirm.

## Facts and Procedural History

This case concerns a petition for adoption of S.A. and L.C. (the "children") filed by N.C. and K.R. ("Prospective Adoptive Parents"). N.C. is the children's maternal grandfather. Mother and Father are unmarried but have been a couple since 2007.

N.C. gained custody of Mother after N.C. and Ni.C. (Mother's mother) divorced. Mother had no contact with Ni.C. for a year after the divorce. During high school, Mother began spending time with Ni.C. and eventually dropped out of school. In February 2007, Mother and Ni.C. moved together from Indiana to Florida. Over the next two years, the two moved back and forth between Indiana and Florida, and Mother never enrolled in school while in Ni.C.'s care.

Mother met Father while in Florida. At that time, Father had a history of juvenile offenses and had been incarcerated in a juvenile facility for a period of eight months. In late 2007, Mother became pregnant with S.A. Mother and Ni.C. moved back and forth between Indiana and Florida during her pregnancy, due in part to disputes with Father.

2

Mother eventually settled in Florida before the birth of S.A.

The Prospective Adoptive Parents visited Florida to lend support to Mother during the birth of S.A in August 2008. During their visit, the Prospective Adoptive Parents observed behavior that was consistent with drug use and drug trafficking by Mother and Father. Father always carried pain pills with him, and he would disappear for long periods of time without explanation. The Prospective Adoptive Parents also observed that there was constant foot traffic at Mother and Father's residence, with many different people constantly coming and going.

In July 2009, Mother and Father moved to Indiana, along with S.A., Lu.A (Father's father), and Father's school-age brothers, V.A. and E.A. The Prospective Adoptive Parents learned of a drug-related incident that occurred in Florida in which a person broke into Mother's house and held her at gunpoint. The Prospective Adoptive Parents allowed the group to stay in their home upon arrival in Indiana and immediately observed signs of drug abuse. After seeing evidence of substance abuse, the Prospective Adoptive Parents informed Mother and Father that they and the rest of the group could no longer stay in their home.

Between July and October 2009, Mother and Father moved several times. They lived with Ni.C., with other relatives, in a motel, and in three other residences in Anderson, Indiana. During this time, the Prospective Adoptive Parents became increasingly concerned with the drug use and residential instability of Mother and Father and the effect it was having on S.A.'s safety and welfare. The Prospective Adoptive Parents expressed these concerns to Mother and Father. They communicated with other family members

about the possibility of staging an intervention, but one was never held. Mother and Father eventually cut off communications with the Prospective Adoptive Parents and would not permit them to have contact with S.A. Due to growing concern, the Prospective Adoptive Parents contacted law enforcement and child protective services, and they filed a petition for guardianship in October 2009. Shortly after, Mother and Father moved to New York with S.A. and were accompanied by Lu.A., V.A., E.A., and A.T., an elderly neighbor.

Mother and Father lived in New York for a period of six weeks. Father claimed they stayed with a friend, but he was unable to provide the friend's name. During their time in New York, Father was investigated by New York Child Protective Services. They returned to Indiana shortly after. Mother and Father continued their drug use and unstable lifestyle. Their employment was intermittent or nonexistent.

On May 27, 2010, Anderson police went to Mother and Father's residence to investigate a request for a welfare check for an elderly woman. Upon searching the residence, an officer found sixty-five-year-old A.T., the neighbor who accompanied Mother and Father to New York. A.T. was locked in a utility closet. The windows in the closet were boarded shut, and the temperature inside was approximately 105 degrees. A bowl for water was on the floor, and a bag of feces hung on the door and was A.T.'s only restroom facility. The only piece of furniture was a urine-soaked mattress. A.T. was emaciated and had sustained severe injuries. Mother and Father were keeping A.T. locked in the utility closet in order to steal her social security benefits and prescription medications. Mother, Father, and Lu.A were immediately arrested. One police officer noted that the rest of Mother and Father's residence was unfit for human habitation.

4

Mother and Father were both charged with criminal confinement, a Class B felony; battery resulting in serious bodily injury, a Class C felony; exploitation of an adult, a Class D felony; financial exploitation of an endangered adult, a Class D felony; two counts of theft, Class D felonies; obtaining a controlled substance by fraud or deceit, a Class D felony; and two counts of possession of a controlled substance, Class D felonies. A jury found Father guilty on all counts except for one count of possession of a controlled substance. He is currently incarcerated in the Indiana Department of Correction and has a projected release date of July 10, 2032. Mother pled guilty to aiding, inducing, or causing battery resulting in serious bodily injury, a Class C felony, and two counts of possession of a controlled substance, Class D felonies.[1]

S.A. was placed with the Prospective Adoptive Parents immediately after Mother and Father were arrested, and S.A. has remained in their care since that time. On May 31, 2010, Mother gave birth to L.C. while incarcerated. L.C. tested positive for opiates, and Mother admitted to abusing drugs during the time she was pregnant with L.C. L.C. was placed with the Prospective Adoptive Parents immediately after his birth.

Father had four or five supervised visits with the children prior to his trial. After his conviction, he has had one supervised visit with S.A. Mother has had no contact with L.C. since his birth, and she had only one visit with S.A. while incarcerated, which occurred against the recommendation of child protective services. A Child in Need of Services ("CHINS") case was opened, and case managers worked with the Prospective Adoptive

---

[1] Mother's projected release date was August 24, 2013. Presumably, she is no longer incarcerated.

5

Parents and visited their home several times. During the CHINS case, the juvenile court issued a no contact order after it determined contact between the children and Mother or Father was not appropriate.

The Prospective Adoptive Parents have maintained custody of the children and are the only parents known to the children. They have developed a stable and loving bond with the children. When the Prospective Adoptive Parents first gained custody of S.A., she was behind on her immunizations and had developmental delays in speech. She has since been enrolled in speech therapy sessions and in a pre-school with an academic curriculum. The children have also participated in other activities, including soccer, gymnastics, and Sunday school. Each of the children have their own furnished bedrooms in the Prospective Adoptive Parents' home. Overall, the trial court found the Prospective Adoptive Parents are "providing a loving, safe, healthy and consistent environment in which the children are growing socially, physically, spiritually and emotionally." Appellants' Appendix at 23.

During her term of incarceration, Mother obtained a GED and completed a problem solving class and received a sentence reduction of six months for each. Mother also participated in a business technology class, a parenting class, and completed a packet on substance abuse. Mother and Father are engaged and plan to continue their relationship. At the hearing, Mother claimed that she intended to facilitate as much contact as possible between Father and the children while Father remains incarcerated. Mother has no meaningful work experience, and her minimal employment skills are derived from a single class taken while incarcerated. Mother has not worked since S.A.'s birth.

Mother intended to live with Ni.C. upon her release from prison. Ni.C.'s husband

6

has a felony conviction for manufacturing methamphetamine, which has been reduced to a lesser included offense. And a minor child living with Ni.C. is the alleged victim of child molestation perpetrated by a relative.

The Prospective Adoptive Parents were awarded guardianship on September 8, 2011, and pending CHINS proceedings were dismissed on September 15, 2011. The Prospective Adoptive Parents filed their petition for adoption on November 1, 2011. Mother and Father contested the adoption. An evidentiary hearing was held over three days in February 2013. The parties submitted proposed findings of fact and conclusions of law. On April 25, 2013, the trial court issued special findings of fact and conclusions of law. The trial court granted the Prospective Adoptive Parents' petition for adoption, finding Mother and Father were unfit and adoption was in the best interests of the children. This appeal followed. Additional facts will be supplied as necessary.

Discussion and Decision

I.   Standard of Review

The trial court issued special findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A). In this case, we apply a two-tiered standard of review: (1) we determine whether the evidence supports the findings of fact and (2) whether the findings support the judgment. In re Adoption of A.S., 912 N.E.2d 840, 851 (Ind. Ct. App. 2009), trans. denied. The trial court's findings or judgment will be set aside only if they are clearly erroneous. Id. A finding of fact is clearly erroneous if the record lacks evidence or reasonable inferences from the evidence to support it. Id.

7

## II. Challenged Findings of Fact

First, Appellants challenge a number of the trial court's findings of fact, arguing that they are clearly erroneous. We will address each challenged finding separately.

Finding 14 states that Father "had a substantial juvenile history and was incarcerated in a juvenile facility for a period of eight (8) months." Appellants' App. at 15. Appellants take issue with the trial court's description of Father's history as "substantial." This is a somewhat nitpicky criticism, as it is undisputed that Father's juvenile history includes acts of battery, domestic battery, resisting law enforcement, aggravated assault, and fraud. Finding 14 is not clearly erroneous.

Finding 21 provides that Mother was held at gunpoint during a drug-related altercation in Florida.[2] At the hearing, Mother admitted the perpetrator was associated with the family through drug transactions but said the incident was not "necessarily" drug-related. Transcript at 137. The evidence was sufficient to create an inference supporting the trial court's finding.

Finding 27 states that the Prospective Adoptive Parents spoke to family members about an intervention and eventually held an intervention. To the extent the finding states that an intervention actually occurred, that statement is not supported by the evidence, and the finding is clearly erroneous.

Finding 30 states Mother and Father moved to New York upon receipt of the Prospective Adoptive Parents' petition for guardianship. Given the circumstances and

---

[2] Appellants also challenge a portion of Finding 21 which states that Appellants hid their car after the incident and left Florida. This fact is irrelevant to the trial court's decision.

timing of the move, the Prospective Adoptive Parents argue the trial court could infer the move to New York was a reaction to the guardianship petition. We agree that the evidence was sufficient to allow this inference, although we do not believe the parents' motivation for the move was a major factor in the trial court's decision. Rather, the sudden move itself is more significant in that it is further proof of the instability created by Mother and Father while they had custody of S.A.

Appellants also challenge the finding that Mother and Father lived in a van in a Burger King parking lot during their time in New York. This finding is not supported by the evidence, where the only mention of this fact was in a question by counsel for the Prospective Adoptive Parents and was denied by Mother. However, it is clear that the trial court did not credit Father's assertion that they lived with a family friend whose name he could not recall. Thus, it is unclear where Appellants and S.A. lived during their six weeks in New York.

Finally, Appellants challenge the statement in Finding 30 that Father was investigated by New York Child Protective Services during their brief time in New York. At the hearing, Father admitted that this investigation occurred. Thus the finding is not clearly erroneous.

Finding 37 states that a police officer testified Mother "knew exactly what was going on" with respect to the inhumane treatment of A.T. Appellants' App. at 18. Indeed, mere observations that a witness testified to certain facts are "not findings of basic fact in the spirit of the requirement." In re Adoption of T.J.F., 798 N.E.2d 867, 874 (Ind. Ct. App. 2003) (quoting Perez v. U.S. Steel Corp., 426 N.E.2d 29, 33 (Ind. 1981)). That said, the

treatment of A.T. occurred inside Mother's own home over a substantial period of time. That, combined with the fact Mother pled guilty to criminal charges related to the treatment of A.T., is sufficient evidence to show Mother knew what was happening.

Appellants challenge Findings 53 and 56, both of which state that there were recommendations made against visitation with Mother and Father in the jail setting. In fact, evidence was presented that the juvenile court issued a no contact order in the CHINS case that would have included visits to the jail by the children. Thus, these findings are supported by the evidence.

Finding 62 states Mother "has had no meaningful work experience and no employment skills, and less than a high school education. She admits that she did not work during [S.A.'s] lifetime." Appellants' App. at 21. Appellants contend this finding is clearly erroneous because Mother took a class while incarcerated in which she learned about various Microsoft Office programs. Appellants argue that class constitutes an employment skill. In our view, this argument is dangerously close to a request to reweigh evidence, which we cannot do. At best, Mother's employment skills are nominal, and it is undisputed that she has little education, no meaningful work experience, and has not worked since before S.A.'s birth. Finding 62 is not clearly erroneous.

Finding 63 states in part that Ni.C. "has a history of marijuana use." Appellants' App. at 21. The Prospective Adoptive Parents contend such an inference could be made because, during a deposition, Ni.C. declined an invitation by counsel to take a voluntary drug screen. No request for a drug screen was ever submitted through the court, and Ni.C. had no obligation to submit to a drug test offered by counsel for the Prospective Adoptive

Parents. We conclude the portion of Finding 63 regarding Ni.C.'s supposed history of marijuana use is unsupported by the evidence.

Finding 66 states that Mother provided an unstable home life while having custody of S.A. and moved several times and lived in several different places, including "motels." Appellants' App. at 21. Appellants disagree with the trial court's insinuation that S.A. lived in multiple motels, and they claim there was evidence of staying in only one motel for a period of six weeks. Clearly, evidence exists to support a finding that S.A. lived in at least one motel. Moreover, the crux of the finding—that Mother and Father led an unstable, transient lifestyle while having custody of S.A.—is supported by the evidence. We conclude Finding 66 is not clearly erroneous.

Finally, Appellants challenge Finding 85, which states that the Prospective Adoptive Parents have many friends and family members who support their efforts to adopt the children. The Prospective Adoptive Parents accurately point to testimony given by K.R. that supports the trial court's finding. Therefore, Finding 85 is not clearly erroneous.

### III. Adoption

Ordinarily, a petition to adopt a minor child may be granted only if written consent to adopt has been provided by the biological parents. See Ind. Code § 31-19-9-1. However, there are a number of exceptions to the consent requirement. See Ind. Code § 31-19-9-8. Specific to this case, parental consent to an adoption is excused if "(A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and (B) the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent." Ind. Code § 31-19-9-8(11). The term "unfit" is not

11

statutorily defined. But this court has previously defined "unfit" as "[u]nsuitable; not adapted or qualified for a particular use or service" or "[m]orally unqualified; incompetent." In re Adoption of M.L., 973 N.E.2d 1216, 1223 (Ind. Ct. App. 2012) (quoting BLACK'S LAW DICTIONARY 1564 (8th ed. 2004)). We have also noted that statutes concerning the termination of parental rights and adoption "strike a similar balance between the parent's rights and the child's best interests," and thus, termination cases provide guidance in determining whether a parent is "unfit." Id.

The trial court found the Prospective Adoptive Parents proved by clear and convincing evidence that the parents were unfit and adoption was in the children's best interests; therefore, parental consent to adoption was not required. When we review a trial court's ruling in an adoption proceeding, the ruling will not be disturbed unless the evidence leads to only one conclusion and the trial court reached the opposite conclusion. Id. at 1222. We do not reweigh evidence, and we consider the evidence most favorable to the decision together with reasonable inferences drawn from that evidence. Id. Further, we "recognize that the trial judge is in the best position to judge the facts, determine witness credibility, get a feel for the family dynamics, and get a sense of the parents and their relationship with their children." Id.

## A. Mother's Unfitness

The trial court concluded there was clear and convincing evidence Mother was unfit. Factors to be considered in making this determination include "a parent's substance abuse, mental health, willingness to follow recommended treatment, lack of insight, instability in housing and employment, and ability to care for a child's special needs." Id. at 1223. The

trial court found several of these factors present in this case.

First, the trial court found Mother had a history of substance abuse. Her drug abuse was ongoing since S.A.'s birth, and that drug abuse occurred in the home and even in the presence of S.A. Further, Mother admitted to abusing drugs even during her pregnancy with L.C., and L.C. tested positive for opiates after he was born during Mother's incarceration.

The parents' substance abuse and potential trafficking created additional safety issues for the children. The trial court found that while the parents lived in Florida, a person broke into their home and held Mother at gunpoint as part of a drug-related altercation.

The trial court also found there was instability in both housing and employment. During the one and one-half years of S.A.'s life, the parents moved at least seven times across three different states. Among their residences were at least one motel and an unknown location during a seemingly unplanned six-week stay in New York. And one police officer described their last residence as unfit for human habitation.

As to employment, Mother did not work during S.A.'s life; she has no meaningful work experience; and her employment skills are limited to a single class taken while incarcerated. The trial court also noted that Mother's employment prospects would only be further hindered by her felony convictions.

Furthermore, the trial court noted a lack of insight on Mother's part. Mother made no effort to provide a safe and stable environment for the children, despite a readily available support system from the Prospective Adoptive Parents. Rather, she continued her detrimental behavior from the time S.A. was born until she was arrested and

13

incarcerated.

This lack of insight is further evidenced by her commitment to continue a relationship with Father and facilitate frequent visitations between Father and the children while he is incarcerated. The trial court also questioned Mother's willingness to live with Ni.C. after her release from prison and place the children in an unstable environment in which an alleged child molestation was recently committed by a relative and Ni.C.'s husband has a prior conviction for manufacturing methamphetamine.

Last but not least, Mother willingly committed heinous crimes against an elderly woman inside Mother's home and knowingly exposed S.A. to that conduct. Mother and Father locked A.T. in a utility closet—under deplorable conditions—for the purpose of stealing her social security benefits and prescription medication. These actions alone evince a moral compass that is unbecoming of a parent, to say the least.

Despite the trial court's findings, Appellants contend the trial court's conclusion of unfitness was clearly erroneous, and they advance several arguments in that vein. First, Appellants note that parental rights should not be terminated "solely because there is a better home available for the children," In re K.S., 750 N.E.2d 832, 837 (Ind. Ct. App. 2001), and claim the trial court's decision was incorrectly made for that reason. We cannot agree. The facts recounted above are sufficient to support the trial court's finding of unfitness, and they are devoid of any reference to the children's prospective home.

Appellants compare this case to In re G.Y, in which our supreme court reversed a trial court's decision to terminate parental rights. 904 N.E.2d 1257, 1258 (Ind. 2009). In that case, the parent was incarcerated with a scheduled release date eighteen months after

the termination hearing; the parent committed her crimes before the child's birth; the parent had bonded with the child through visitation; and the parent had made progress through drug treatment programs while incarcerated. In re G.Y. is distinguishable from this case. Mother committed her crimes not only during S.A.'s lifetime but in the presence of S.A., and the trial court found Mother did not have a strong bond with S.A. and that she had no bond whatsoever with L.C.

Finally, Appellants argue the trial court did not give enough consideration to Mother's obtainment of her GED and other classes taken during her term of incarceration. Our standard of review obligates us to decline Appellants' request to reweigh the evidence. Even if Mother's conduct has arguably improved since her arrest, the evidence favorable to the judgment reflects her unfitness. The trial court did not believe Mother had made sufficient improvements to be considered a fit parent nor did it believe such improvement was likely, noting that adoption should not be denied "on the speculative chance that [Mother] might someday be a fit parent." Appellants' App. at 32-33. This is a judgment call we are not in a position to question.

## B. Father's Unfitness

The trial court likewise found there was clear and convincing evidence proving Father was unfit. Because Mother and Father lived together and shared responsibility for S.A. from the time she was born until their arrest, many of the facts relied on to find Mother unfit equally apply to Father. Those circumstances include Father's unsafe and unstable living situations, continuous drug abuse, and criminal behavior. Father admitted he had a substantial drug problem which included the use of cocaine, heroin, crack cocaine,

15

marijuana, prescription pain medication, and alcohol.

Additional facts support the trial court's finding that Father is unfit. As noted above, mental health is another factor that may be considered in determining whether a parent is unfit. See In re Adoption of M.L., 973 N.E.2d at 1223. Father has been diagnosed with bipolar disorder and has been previously treated with Zoloft, Prozac, and Seroquel. Father also admitted to attempting suicide three different times.

Appellants argue the trial court improperly considered Father's lengthy term of incarceration. We disagree. It is true in cases involving the issue of abandonment we have said "[i]mprisonment standing alone does not . . . allow an adoption to take place without obtaining the consent of an incarcerated parent." In re Adoption of Herman, 406 N.E.2d 277, 279 (Ind. Ct. App. 1980). However, the trial court's order cannot fairly be read as having been based solely on Father's incarceration, where his drug abuse, criminal behavior, mental health, and provision of an unstable environment for S.A. were all circumstances considered by the trial court. That said, we believe Father's lengthy incarceration—which will continue after both children have reached the age of majority— and consequential inability to support the children, is a factor the trial court may properly consider in its analysis.[3]

### C. Best Interests of the Children

Finally, Appellants contest the trial court's conclusion that adoption by the

---

[3] Appellants' remaining arguments as to Father's fitness are similar to those made with respect to Mother, and we are asked to consider alleged improvements made by Father since his incarceration. These arguments are unavailing because, again, we do not reweigh evidence.

Prospective Adoptive Parents is in the children's best interests. "[T]he primary concern in every adoption proceeding is the best interest of the child." In re Adoption of K.S.P., 804 N.E.2d 1253, 1255 (Ind. Ct. App. 2004) (citation omitted). At the time the hearings were held by the trial court, the Prospective Adoptive Parents had maintained physical custody over the children for nearly three years. As the trial court noted, the children consider the Prospective Adoptive Parents their true parents and have developed a close relationship with them. The Prospective Adoptive Parents are willing and able to provide a stable environment for the children and care for them emotionally and financially. Overall, the evidence supports the trial court's conclusion that adoption is in the children's best interests.

Arguing adoption is not in the children's best interest, Appellants state that the Prospective Adoptive Parents "thwarted" efforts by Mother and Father to have contact with the children prior to the hearings. Brief of Appellants at 17. Appellants believe this conduct reflects poorly on the Prospective Adoptive Parents. We do not find this position persuasive, given that the juvenile court issued a no contact order during CHINS proceedings because it did not believe contact between the parents and children was appropriate.

Finally, Appellants state that the Prospective Adoptive Parents' ability to provide a higher standard of living for the children does not mean adoption is in the children's best interests. We agree. That said, Appellants seem to concede the children's standard of living will be better with the Prospective Adoptive Parents, and Appellants do not explain how that fact renders the trial court's judgment clearly erroneous.

## Conclusion

Concluding the trial court's decision to grant the petition for adoption was not clearly erroneous, we affirm.

Affirmed.

BARNES, J., and BROWN, J., concur.