

FILED

Jul 29 2020, 9:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John R. Worman
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Yvette M. LaPlante
LaPlante, LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Adoption of K.H., D.R., *Appellant*, v. M.M. and C.M., *Appellees*. | July 29, 2020 |
| | Court of Appeals Case No. 20A-AD-337 |
| | Appeal from the Vanderburgh Superior Court |
| | The Honorable Brett J. Niemeier, Judge |
| | The Honorable Renee Allen Ferguson, Magistrate |
| | Trial Court Cause No. 82D04-1811-AD-210 |

**Brown, Judge.**

[1] D.R. appeals the trial court's decree of adoption. We affirm.

## *Facts and Procedural History*

[2] On April 24, 2017, K.H. was born to Ka.H. ("Mother"). Under cause number 82D04-1704-JC-768 ("Cause No. 768"), the Indiana Department of Children Services ("DCS") filed a petition on April 27, 2017, alleging K.H. was a child in need of services ("CHINS") in the Vanderburgh Superior Court. On April 11, 2018, a chronological case summary ("CCS") entry under Cause No. 768 noted that "DCS has filed termination on this child (82D04-1802-JT-359)."[1] Appellant's Appendix Volume II at 90.

[3] Under Cause No. 768, a CCS entry dated September 13, 2018, indicated "State will be filing to add [D.R.] as an alleged father." *Id.* at 89. The court appointed counsel for D.R., and counsel requested a DNA test. A CCS entry dated October 15, 2018, mentions "DNA Results." *Id.* at 88. An October 24, 2018 CCS entry states:

> [D.R.'s counsel] says that [D.R.] has had DNA done to confirm he is the father. DCS moves to show him as father; Court orders. . . . Over [D.R.'s counsel's] objection, Court allows DCS to orally amend. There are no allegations against father in the petition and he has no objection to the child being found to be a

---

[1] Under cause number 82D04-1802-JT-359 ("Cause No. 359"), DCS filed a petition to terminate the parental rights of Mother, T.J. (Alleged Father), and "Unknown Alleged Father." February 23, 2018 Verified Petition for Involuntary Termination of Parent-Child Relationship under Cause No. 359. On June 6, 2018, Mother signed a voluntary relinquishment of parental rights, and the court entered an order terminating her parental rights. On December 3, 2019, the court entered an order granting the petition for termination of the parent-child relationship.

> CHINS. He is at VCCC until February. He is to sign a release
> for VCCC. He does want services and visitation, Mother's rights
> have been terminated.

*Id.*

[4] On November 7, 2018, M.M. and C.M. filed a petition to adopt K.H. under cause number 82D04-1811-AD-210, the cause from which this appeal arises, in the Vanderburgh Superior Court. On November 21, 2018, D.R. filed an objection to the adoption and requested an attorney. The court appointed counsel for him.

[5] In a document dated July 5, 2018, and titled "Indiana State Department of Health Putative Father Registry Affidavit," Evelyn Riley asserted that she was responsible for the administration of the Putative Father Registry, searched the registry for K.H. and Mother, and found no putative father was registered and that no paternity determination was on file with the department. *Id.* at 29 (capitalization omitted).

[6] On June 11, 2019, the court held a hearing, and counsel for M.M. and C.M. argued D.R.'s consent to the adoption was not necessary. Specifically, he asserted: "We believe we've got I.C. 31-19-9-8(a)11, unfit parent, best interest of the child. We think we've got 31-19-9-8(a)6, token effort with the child. We've got I.C. 31-19-9-15, he f[a]iled to file a paternity action. And the last is 31-19-5-18, failure to register as the putative Father." Transcript Volume II at 5.

[7] D.R. testified he was in custody for a DUI and an assault which occurred the previous night, but that he did not know whom he had allegedly assaulted. He testified he went to the hospital after K.H. was born and was told that the baby was not his. When asked if he did not have any contact with K.H. for the first eighteen months of his life, he answered: "Right, 'cause I was told that it wasn't mine so I left it alone. I ain't gonna go around looking for a kid." *Id.* at 7. Counsel for M.M. and C.M. asked: "Now you have not filed a putative Father affidavit." *Id.* He answered: "Yes, I have." *Id.* D.R.'s counsel stated she believed "that was filed right after we had our hearing where he was established" and later stated "I don't have it with me, but we did do it." *Id.* D.R. indicated he did not initially obtain any presents for K.H., but he did so after he became aware he was the father at the time of the DNA test in October 2018. M.M. and C.M.'s counsel asked: "But you haven't done anything prior to the DNA results, correct, in regard to the child?" *Id.* at 10-11. D.R. answered: "Yes. I've done everything. I've fed and bought toys and all." *Id.* at 11. D.R. denied refusing to complete a substance abuse evaluation. When asked if he had completed NOW Counseling, he answered: "Yes, I did, and when I got released from the Safe House they told me that I didn't have to continue. Same thing (Indiscernible) was talking about. Until I got this new case worker, then she wanted me to start all that stuff over. I'm not gonna do that." *Id.* He testified that he went to Fatherhood Engagement Services "once a week. Went twice a week." *Id.* at 12. He denied that the police were called to his house on February 21, 2019, regarding domestic violence. When asked if he was kicked out of his house or his girlfriend's house, he answered: "Yeah,

but wasn't no police involved. It was a freaking argument." *Id.* at 13. He indicated he had eight children including "four grown, four little." *Id.* at 14. He testified he worked at Rally's on 41 and Tristate Cylinder and lived with his fiancée. He asserted that visits which "ended early wasn't on" him and that DCS canceled visits. *Id.* at 15. On cross-examination, he testified he was in jail and on his way to the "Safe House" when there was a DCS case against Mother. *Id.* at 21. He related he has good relationships with all his children and that he has three in Evansville besides K.H., two in Lexington, and two in Hopskinsville.

[8] Lauren Koehler, a foster care specialist and family case manager for DCS, testified that D.R. did not comply with the mandates of DCS. Court Appointed Special Advocate Linda Atchison ("CASA Atchison") testified that K.H. had been in the care of the foster parents since two days after his birth, foster parents also had two of K.H.'s half-siblings, and D.R. initially told her that he was not interested in taking K.H. away from his siblings and not interested in services at that time. She testified her concern with several visits ending early, including one in which D.R. stated "it was because it was his birthday." *Id.* at 45. She indicated she heard D.R. testify that it was his birthday but he had to attend a meeting and, when asked if she was saying she verified that was not the case, she answered: "Yeah, they told me there was no meeting scheduled on that Sunday evening." *Id.* at 46. She testified D.R. told her he had eight children and that they were all around the age of two years, but he later reported their ages ranged from nineteen years to two years. She testified that the only time

D.R. participated in the NOW Counseling was when he was at the Safe House or in jail and that he told her he was going to participate in NOW Counseling when he was released but did not do so. D.R. was a "no call, no show on February the 12th, February 14th, February 21st, and February 26[th]" for random drug screens, tested positive for alcohol on February 22nd, and "was a no call, no show on March 21st of 2019, March 28th of 2019, April 3rd of 2019, April 9th of 2019, and April 18th of 2019." *Id.* at 51, 53. She recommended that the adoption be granted. On cross-examination, she testified that "on January the 22nd while [D.R.] was at the Safe House and he was very close to ending his time there, he was PTRed because of smoking a leafy green substance" and his conduct "just didn't show a commitment to developing that relationship." *Id.* at 56-57. When asked if she believed D.R. had given anything more than a token effort in being involved with the child, she answered in the negative.

[9]     On June 25, 2019, the hearing continued. Lee Poag, a field case worker with Ireland Home Based Services, testified D.R. was one of his clients for supervised visitations and Fatherhood Engagement. He testified that he observed primarily positive interactions between K.H. and D.R., D.R. always had what was necessary for the visits including food, diapers, wipes, and toys, D.R. followed a lot of his recommendations, and the bond between them became better as visits progressed. On cross-examination, he stated that D.R. was one of his first clients, D.R. was in jail when he first started working on the case on December 3rd until he was released in February, and he was remanded back to jail in January for smoking a leafy green substance. He also testified

that D.R. was not complying with services, D.R. was not going to change his mind despite his encouragement, and D.R. stated he "won't take orders from anybody." *Id.* at 84.

[10] On July 22, 2019, the court entered an order finding that D.R.'s consent to the adoption was not required. The court found:

> 1. [K.H.] is a ward of the Court under the care and supervision of the Vanderburgh County Department of Child Services ("VCDCS") under Cause No. [768] ("CHINS case").
>
> 2. The Petitioners, [M.M.] and [C.M.], are [K.H.'s] licensed foster parents and pre-adoptive placement.
>
> 3. [K.H.] was born on April 24, 2017 and is two (2) years old.
>
> 4. [D.R.] ([] "Putative Father") claims to be [K.H.'s] father but has never established paternity. [D.R.] was shown to be the biological father of the child as indicated by a DNA test taken as part of the Child In Need of Services case. There has been no formal adjudication by a court of [K.H.'s] paternity.
>
> 5. [K.H.'s] Mother is [Ka.H.]. She executed a voluntary termination of parental rights on June 6, 2018 in [Cause No. 359].
>
> 6. [Mother] and [D.R.] were never married to each other.
>
> 7. On September 13, 2018, [D.R.] was added as a party to the CHINS case.
>
> 8. On October 24, 2018, [D.R.] was confirmed as the biological father of [K.H.] through DNA testing as part of the CHINS case.
>
> 9. Further, Disposition in the CHINS case was held for [D.R.] on November 21[,] 2018. [D.R.] was present for the hearing. At

the time of the hearing [D.R.] was at the Vanderburgh Community Corrections Complex ("VCCC").

10. The Disposition Order stated that [D.R.] was to participate in the Fatherhood Engagement Program, have supervised visitation, and remain drug and alcohol free. A substance abuse evaluation and any recommended therapy or treatment was taken under advisement by the Court.

11. [D.R.] began services working with Lee Poag ("Lee") from Ireland Home Based Services on the Fatherhood Engagement Program. Lee also supervised visitation.

12. Lee stated that in the beginning [D.R.] was cooperative.

13. Lee testified that as the case moved forward [D.R.] was less cooperative and finally did not want to participate in services.

14. [D.R.] began working two jobs and stated to Lee that he didn't have time for services and there was nothing that he needed to work on.

15. On March 25, 2019, VCDCS, filed a Motion to Modify Disposition in regard to [D.R.] due to [D.R.] testing positive for drugs while placed in the VCCC.

16. Based on the positive drug test, the CHINS Court ordered that [D.R.] undergo a substance abuse evaluation and follow any recommended treatment or therapy.

17. [D.R.] never followed through with the Court's order.

18. Finally in April of 2019, [D.R.] told Lee that he wasn't going to cooperate with VCDCS, that he didn't have anything that he needed to learn, and that he would only comply on his terms.

19. [D.R.] never established paternity of [K.H.] by a court proceeding or by executing a paternity affidavit, pursuant to Indiana Code section 31-19-9-8(a)(3) and (6), the Putative Father's consent is not necessary for Petitioners to adopt [K.H.].

20. Additionally, the court finds that by clear and convincing evidence that [D.R.] is unfit to parent [K.H.] and it is in the best interest of the child to dispense with [D.R.'s] consent as provided in Indiana Code section 31-19-9-8(a)(11). Putative Father has never been in this child's life and when presented with the opportunity to learn to parent the child, he states that he doesn't have time and will only do things on his terms. Further [D.R.] cannot obey the criminal statutes of Indiana long enough to remain free to participate in services or parent [K.H.].

Appellant's Appendix Volume II at 64-66. On January 30, 2020, the court entered a decree of adoption which found in part that "by Order of this Court dated July 22, 2019 his consent to this adoption is not required." *Id.* at 76.

### *Discussion*

In family law matters, we generally give considerable deference to the trial court's decision because we recognize that the trial judge is in the best position to judge the facts, determine witness credibility, and obtain a feel for the family dynamics and a sense of the parents and their relationship with their children. *E.B.F. v. D.F.*, 93 N.E.3d 759, 762 (Ind. 2018). Accordingly, when reviewing an adoption case, we presume that the trial court's decision is correct, and the appellant bears the burden of rebutting this presumption. *Id.* When reviewing the trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion. *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014). The trial court's findings and judgment will be set aside only if they are clearly erroneous. *E.B.F.*, 93 N.E.3d at 762. A judgment is clearly erroneous when

there is no evidence supporting the findings or the findings fail to support the judgment. *Id.* We will not reweigh evidence or assess the credibility of witnesses. *Id.* Rather, we examine the evidence in the light most favorable to the trial court's decision. *Id.*

[12] D.R. asserts that he was established to be K.H.'s father by the court in Cause No. 768 on October 24, 2018. He also asserts that he filed with the putative father registry. He argues that his consent is not irrevocably implied because he timely filed his motion to contest the adoption. He also argues that the court erred in finding that he was unfit to parent K.H. and in finding that it was in the child's best interest to dispense with his consent as provided in Ind. Code § 31-19-9-8(a)(11). M.M. and C.M. respond that D.R.'s consent was not required because he had only made token efforts with the child, he failed to file a paternity action and his consent is not required under Ind. Code § 31-19-9-15, he failed to register with the putative father registry, he was unfit to parent, and adoption was in the child's best interest.

[13] Ind. Code § 31-19-11-1 provides in part that the trial court shall grant a petition for adoption if it hears evidence and finds in part that the adoption requested is in the best interest of the child and "proper consent, if consent is necessary, to the adoption has been given." A petition to adopt a child may be granted only if written consent to adoption has been executed by the father of a child whose paternity has been established. *See* Ind. Code § 31-19-9-1. However, Ind. Code § 31-19-9-8(a) provides that consent to adoption "is not required from any of the following":

(3) The biological father of a child born out of wedlock whose paternity has not been established:

> (A) by a court proceeding other than the adoption proceeding; or

> (B) by executing a paternity affidavit under IC 16-37-2-2.1.

> \* \* \* \* \*

(5) The putative father of a child born out of wedlock if the putative father's consent to adoption is irrevocably implied under section 15 of this chapter.[2]

(6) The biological father of a child born out of wedlock if the:

> (A) father's paternity is established after the filing of a petition for adoption in a court proceeding or by executing a paternity affidavit under IC 16-37-2-2.1; and

---

[2] Ind. Code § 31-19-9-15 provides:

(a) The putative father's consent to adoption of the child is irrevocably implied without further court action if the father:
>    (1) fails to file a paternity action:
>        (A) under IC 31-14; or
>        (B) in a court located in another state that is competent to obtain jurisdiction over the paternity action;
>    not more than thirty (30) days after receiving actual notice under IC 31-19-3 of the mother's intent to proceed with an adoptive placement of the child, regardless of whether the child is born before or after the expiration of the thirty (30) day period; or
>    (2) files a paternity action:
>        (A) under IC 31-14; or
>        (B) in a court located in another state that is competent to obtain jurisdiction over the paternity action;
>    during the thirty (30) day period prescribed by subdivision (1) and fails to establish paternity in the paternity proceeding under IC 31-14 or the laws applicable to a court of another state when the court obtains jurisdiction over the paternity action.

(b) This section does not prohibit a putative father who meets the requirements of section 17(b) of this chapter from establishing paternity of the child.

> (B) father is required to but does not register with the putative father registry established by IC 31-19-5 within the period required by IC 31-19-5-12.

> \* \* \* \* \*

> (11) A parent if:

>> (A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and

>> (B) the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent.

Ind. Code § 31-19-9-8(a) is written in the disjunctive. *In re Adoption of B.R.*, 877 N.E.2d 217, 218 (Ind. Ct. App. 2007). Ind. Code § 31-19-9-8(b) provides that "[i]f a parent has made only token efforts to support or to communicate with the child the court may declare the child abandoned by the parent." We note that Ind. Code § 31-14-2-1 is titled "Exclusive methods of establishing paternity" and provides: "A man's paternity may only be established: (1) in an action under this article; or (2) by executing a paternity affidavit in accordance with IC 16-37-2-2.1." We may affirm a trial court order on any basis supported by the record. *Wishard Mem'l Hosp. v. Kerr*, 846 N.E.2d 1083, 1093 (Ind. Ct. App. 2006).

[14] If a petition for adoption alleges that a parent's consent to adoption is unnecessary under Ind. Code § 31-19-9-8(a)(11) and "the parent files a motion to contest the adoption," the "petitioner for adoption has the burden of proving that the requirements of IC 31-19-9-8(a)(11) are satisfied and that the best

interests of the child are served if the court dispenses with the parent's consent to adoption."[3]  Ind. Code § 31-19-10-1.2(e).  Ind. Code § 31-19-10-0.5 provides: "The party bearing the burden of proof in a proceeding under this chapter must prove the party's case by clear and convincing evidence."

[15]  The clear and convincing evidence standard is an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt.  *See T.D. v. Eskenazi Health Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015).  In order to be clear and convincing, the existence of a fact must be highly probable.  *Id.*  "The clear and convincing standard is employed in cases where the wisdom of experience has demonstrated the need for greater certainty, and where this high standard is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals."  *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 276 (Ind. 2015) (citation and internal quotation marks omitted).

[16]  This Court has observed that imprisonment standing alone does not establish statutory abandonment.  *Lewis v. Roberts*, 495 N.E.2d 810, 813 (Ind. Ct. App. 1986) (citation omitted) (cited with approval by *In re Adoption of E.A.*, 43 N.E.3d 592 (Ind. Ct. App. 2015), *trans. denied*).  Neither should confinement alone constitute justifiable reason for failing to maintain significant communication

___

[3] Ind. Code § 31-9-2-88 provides that "[p]arent" "for purposes of the juvenile law, means a biological or an adoptive parent."

with one's child.  *Id.*  Incarceration, however, unquestionably alters the means for significant communication.  *Id.*  What constitutes insignificant communication with a free parent may be significant in relation to an incarcerated parent with limited access to his child.  *Id.*

[17]  D.R. does not allege and the record does not reveal that he established paternity by a court proceeding or by executing a paternity affidavit under Ind. Code § 16-37-2-2.1.[4]  Thus, D.R.'s consent to the adoption of K.H. was not required pursuant to Ind. Code § 31-19-9-8(a)(3), which provides that consent to adoption is not required from "[t]he biological father of a child born out of wedlock whose paternity has not been established: (A) by a court proceeding other than the adoption proceeding; or (B) by executing a paternity affidavit under IC 16-37-2-2.1."

[18]  Even assuming that Ind. Code § 31-19-9-8(a)(3) did not apply, we cannot say that reversal is warranted.  Ind. Code § 31-19-9-8(a)(11) provides that consent to adoption "is not required from . . . [a] parent if . . . a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and . . . the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent."  While the term "unfit" as used in Ind. Code § 31-19-9-8(a)(11) is not statutorily defined, this Court has defined

---

[4] To the extent D.R. asserts he was established to be K.H.'s father by the court in the CHINS action, Cause No. 768, we note that Ind. Code § 31-14-2-1, which is titled "Exclusive methods of establishing paternity," provides: "A man's paternity may only be established: (1) in an action under this article; or (2) by executing a paternity affidavit in accordance with IC 16-37-2-2.1."

"unfit" as "[u]nsuitable; not adapted or qualified for a particular use or service" or "[m]orally unqualified; incompetent." *In re Adoption of M.L.*, 973 N.E.2d 1216, 1223 (Ind. Ct. App. 2012) (quoting BLACK'S LAW DICTIONARY 1564 (8th ed. 2004)).

[19] We have also noted that statutes concerning the termination of parental rights and adoption "strike a similar balance between the parent's rights and the child's best interests" and thus termination cases provide useful guidance in determining whether a parent is unfit. *Id.* Termination cases have considered factors such as a parent's substance abuse, mental health, willingness to follow recommended treatment, lack of insight, instability in housing and employment, and ability to care for a child's special needs. *Id.* Also, this Court has consistently held in the termination context that it need not wait until children are irreversibly harmed such that their physical, mental, and social development are permanently impaired before terminating the parent-child relationship. *See In re A.P.*, 981 N.E.2d 75, 83 (Ind. Ct. App. 2012). It is well-settled that individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children. *In re Adoption of H.N.P.G.*, 878 N.E.2d 900, 907 (Ind. Ct. App. 2008), *trans. denied*, *cert. denied*, 555 U.S. 1034, 129 S. Ct. 619 (2008). A parent's criminal history is relevant to whether the parent is unfit under Ind. Code § 31-19-9-8(a)(11). *See In re T.W.*, 859 N.E.2d 1215, 1218-1219 (Ind. Ct. App. 2006) (discussing evidence of the father's criminal history in reviewing a finding of parental unfitness).

[20] The record reveals that K.H. was born on April 24, 2017, and that D.R. did not request a DNA test before September 2018, or file a paternity affidavit or establish paternity under Ind. Code Article 31-14. At the June 11, 2019 hearing, D.R. testified he was in custody for DUI and assault, the assault occurred the previous night, and he did not know whom he allegedly assaulted. When asked if he did not have any contact with K.H. for the first eighteen months of his life, he answered: "Right, 'cause I was told that it wasn't mine so I left it alone. I ain't gonna go around looking for a kid." Transcript Volume II at 7. He testified he was in jail and on his way to the "Safe House" when there was a DCS case against K.H.'s mother. *Id.* at 21. Koehler, the foster care specialist and family case manager for DCS, testified that D.R. did not comply with the mandates of DCS. CASA Atchison testified that K.H. had been in the care of the foster parents since two days after his birth, foster parents also had two of K.H.'s half-siblings, and D.R. initially told her that he was not interested in taking K.H. away from his siblings and was not interested in services at that time. She testified regarding her concern that several visits ended early, including one in which D.R. stated "it was because it was his birthday." *Id.* at 45. She testified D.R. was a "no call, no show on February the 12th, February 14th, February 21st, and February 26[th]" for random drug screens, tested positive for alcohol on February 22nd, and "was a no call, no show on March 21st of 2019, March 28th of 2019, April 3rd of 2019, April 9th of 2019, and April 18th of 2019." *Id.* at 51, 53. When asked her recommendation, CASA Atchison answered:

[M]y recommendation is that the adoption be granted. I feel that there's been no consistencies with making [K.H.] a priority. I feel like there's just always something that kind of takes precedence over [K.H.]. And I just don't think that that is in his best interest. I think he needs to continue that stability and I just haven't seen that cooperation from [D.R.] to be able to provide for [K.H.] the way I think he deserves to be provided.

*Id.* at 54. She testified that "on January the 22nd while [D.R.] was at the Safe House and he was very close to ending his time there, he was PTRed because of smoking a leafy green substance" and that D.R.'s conduct "just didn't show a commitment to developing that relationship." *Id.* at 56-57. When asked if she believed D.R. had given anything more than a token effort in being involved with the child, she answered:

No. I feel like [K.H.] deserves to have the very best and that's always been my focus. You know, I think this is a little bit unusual situation. And again, I'm looking at it from [K.H.'s] point. You know, he is in a home for 18 months of his life, his whole life. He identifies with those foster parents as Mom and Dad, he does. Whether it's anyone's fault or not, that's the truth. That's what he does. And, you know, to take him out of that situation I would want to see a more consistent effort. I would want to see that [D.R.] did not take the chance that if he smoked that green leafy substance he was gonna go back to jail and he wasn't gonna get to see his child. That if he had two police runs where he became angry with his girlfriend that he wanted to place [K.H.] with. My goodness, what if [K.H.] had been there? Those are the things that I do as the CASA. I want to see that consistency that I know [K.H.] would be safe and that he would always be put number one over cigarettes and green leafy substances and alcohol and . . . his birthday. And the whole thing – the substance abuse eval, when we came back for the

modification Judge Niemeier said, "You need to go for the substance abuse eval. If they say you don't have a problem and you don't need treatment, you don't have to do treatment." So how hard would that have been to go get a substance abuse eval? But he refused to do that. And I think it's become more of just a challenge, like nobody's gonna tell me what to do. And I don't think that's what's best for [K.H.].

*Id.* at 63. The trial court was in the best position to judge the facts, and we will not reweigh evidence or assess the credibility of the witnesses. We cannot say under these circumstances that D.R. has met his burden to overcome the presumption the trial court's decision is correct or that the evidence leads to but one conclusion and the trial court reached the opposite conclusion.

[21] For the foregoing reasons, we affirm the judgment of the trial court.

[22] Affirmed.

Najam, J., and Kirsch, J., concur.